**William Ernest KUENZEL, Petitioner,**

v.

**Richard F. ALLEN, Commissioner of the Alabama Department of Corrections, and the Attorney General of the State of Alabama, Respondents.**

**Case No. 1:00–CV–316–IPJ–TMP.**

United States District Court,
N.D. Alabama,
Eastern Division.

Jan. 12, 2011.

David A. Kochman, Reed Smith LLP, Jeffrey E. Glen, Anderson Kill & Olick PC, David Dretzin, New York, NY, Rick L. Burgess, Birmingham, AL, for Petitioner.

Troy R. King, J. Clayton Crenshaw, James R. Houts, Office of the Attorney General, Montgomery, AL, David R. Clark, Prattville, AL, for Respondents.

### ORDER DENYING RULE 60(b) MOTION

INGE PRYTZ JOHNSON, District Judge.

On December 16, 2009, 880 F.Supp.2d 1162, 2009 WL 8636196 (N.D.Ala.2009),

the court entered its memorandum opinion and final order dismissing the instant petition for writ of *habeas corpus,* finding that the petition was time barred under 28 U.S.C. § 2244(d) and that petitioner had shown neither equitable tolling nor actual innocence as a way to avoid the time bar. On January 13, 2010, petitioner filed his notice of appeal, together with an application for leave to appeal *in forma pauperis* and an application for a certificate of probable cause.[1] On March 10, 2010, petitioner filed the instant motion pursuant to Rule 60(b)(1), (2), (3), and (6) of the *Federal Rules of Civil Procedure,* seeking to have the dismissal of his *habeas* petition vacated. (Doc. 121) The motion alleged that "new evidence" discovered only days before the filing of the motion revealed "defects in the integrity of these *habeas* proceedings." In a telephonic status conference with a magistrate judge of this court on March 19, 2010, the parties were given a schedule for briefing the Rule 60(b) motion, and on May 14, 2010, the respondents filed their response to the motion (Doc. 125). Petitioner filed his reply to the response on May 24, 2010 (Doc. 127), and further supplemented it with additional evidence on September 30, 2010. (Docs. 135 & 136). Having carefully considered all of the filings with respect to the Rule 60(b) motion, the court hereby denies it for the reasons explained below.

1. The court will dispose of these applications in a separate order.

2. These portions of Rule 60(b) read, in part, as follows:
 On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
 (1) mistake, inadvertence, surprise, or excusable neglect;
 (2) newly discovered evidence that, with reasonable diligence, could not have been

## A. The Motion

The motion alleges that the respondents have committed a fraud upon the court or otherwise have engaged in misconduct affecting the integrity of the *habeas* proceedings, for which relief may be available under Rule 60(b)(1), (2), (3), or (6).[2] Petitioner alleges that, On February 22, 2010, following the dismissal of his *habeas* petition, counsel for respondents visited Crystal Floyd Moore[3] bringing with him two bags of documents, and asked Ms. Moore questions about certain of the documents. Thereafter, respondents produced to petitioner six documents never previously disclosed to him. These documents were:

(1) an unsigned and undated investigative statement taken from Crystal Floyd (Moore) by police in the aftermath of the murder;

(2) a transcript of the testimony of Crystal Floyd (Moore) before the grand jury that charged petitioner with capital murder;

(3) a transcript of a statement taken from Crystal Epperson (Ward) by police on December 9, 1987;

(4) a transcript of the testimony of Crystal Epperson (Ward) before the grand jury that charged petitioner with capital murder;

(5) a transcript of a statement taken from April Harris by police on December 9, 1987; and

discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

\* \* \*

(6) any other reason that justifies relief.

3. It should be noted that Crystal Floyd Moore was not a witness during the petitioner's trial. She was, at the time of the murder, Harvey Venn's thirteen-year-old girlfriend.

(6) a transcript of April Harris's testimony before the grand jury that charged petitioner with capital murder.

Petitioner now argues that these documents "are consistent with certain key testimony they offered years later," after petitioner was convicted and while he was challenging the conviction and sentence.[4] Petitioner contends that, if this evidence had been produced before the dismissal of his *habeas* petition, it would have bolstered and strengthened his claim of actual innocence, and, therefore, respondents' failure to produce it was fraud or misconduct that prejudiced him. Based on the recent production of these documents, petitioner contends the following:

> Kuenzel respectfully submits that a true and accurate picture of all plainly relevant facts should determine his fate, and should have been available to this Court in its determination of Kuenzel's entitlement to pass through the Likely Acquittal Gateway. This Court, and not Respondents, should decide what is relevant and what is not relevant to Kuenzel's gateway claim. By their actions, Respondents have deprived this Court of the opportunity to render a judgment based upon a full evidentiary record. Now that Respondents have revealed the existence of materials possessed in their files that they believe to be sufficiently important to show to a lay witness, Kuenzel submits that both he and this Court should be given an opportunity to review, analyze, and debate the relevance of all the evidence possessed by the State in the

context of the Likely Acquittal Gateway.

(*See* Doc. 121, pp. 3–4).

### B. The Function of Rule 60(b) Motions in Habeas Proceedings

■ The Supreme Court has made clear that the function of a Rule 60(b) motion in *habeas* proceedings is more constrained than in other civil litigation. Because the Anti-terrorism and Effective Death Penalty Act prohibits the filing of successive *habeas* petitions except with pre-approval by the court of appeals, a Rule 60(b) motion that does nothing more than challenge the correctness of the court's previous ruling on the merits of the petition is regarded not as a proper Rule 60(b) motion, but a prohibited successive petition. *See Gonzalez v. Crosby,* 545 U.S. 524, 532, 125 S.Ct. 2641, 2648, 162 L.Ed.2d 480 (2005). The Eleventh Circuit has explained this limitation as follows:

> Federal Rule of Civil Procedure 60 provides a basis, but only a limited basis, for a party to seek relief from a final judgment in a habeas case. *See* Fed. R.Civ.P. 60. The Supreme Court explained in *Gonzalez v. Crosby,* 545 U.S. 524, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005), that the Federal Rules of Civil Procedure apply to habeas proceedings to the extent that they are "not inconsistent with applicable federal statutory provisions," *id.* at 529, 125 S.Ct. at 2646 (quoting 28 U.S.C. § 2254 Rule 11) (internal marks omitted), and the Antiterrorism and Effective Death Penalty Act does not explicitly limit the operation of Rule 60(b). *Id.* The Act does, nonetheless, foreclose application of that rule where it would be inconsistent with the

---

4. Petitioner points to declarations given by Crystal Floyd Moore in 1997 and 2008, and a transcript of a tape-recorded interview of Crystal Epperson Ward in 1999, as being consistent with their statements in these recently produced documents. There are no recent statements from April Harris, her only evidence being her grand jury and trial testimony. The court will analyze this claim later in this opinion.

restrictions imposed on successive petitions by the AEDPA. *Id.* at 529–30, 125 S.Ct. at 2646.

The Supreme Court held in *Gonzalez* that a Rule 60(b) motion is to be treated as a successive habeas petition if it: (1) "seeks to add a new ground of relief;" or (2) "attacks the federal court's previous resolution of a claim on the merits." *Id.* at 532, 125 S.Ct. at 2648. Where, however, a Rule 60(b) motion "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings," the motion is not a successive habeas petition. *Id.* A "claim," as described by the Court in *Gonzalez*, is "an asserted federal basis for relief from a state court's judgment of conviction." *Id.* at 530, 125 S.Ct. at 2647. The Supreme Court further explained in *Gonzalez* that:

> The term "on the merits" has multiple usages. We refer here to a determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. § 2254(a) and (b). When a movant asserts one of those grounds (or asserts that a previous ruling regarding one of those grounds was in error) he is making a habeas corpus claim. He is not doing so when he merely asserts that a previous ruling which precluded a merits determination was in error—for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar.

*Id.* at 532 n. 4, 125 S.Ct. at 2648 n. 4 (citation omitted).

■ *Williams v. Chatman*, 510 F.3d 1290, 1293–1294 (11th Cir.2007). Thus, a Rule 60(b) motion that argues simply that there is new evidence or new grounds suggesting that the court incorrectly decided the "merits" of a federal *habeas*

claim is a prohibited successive petition. Such a motion attempts to relitigate the "merits" of a claim for *habeas* relief, and as such, it is considered a successive *habeas* petition. On the other hand, a Rule 60(b) motion that asserts a defect in the integrity of the proceedings themselves—one that attempts to correct a flaw in the proceedings leading to the court's determination of the "merits" of a claim—is a genuine Rule 60(b) motion, not barred by the AEDPA's successiveness provision.

### C. The Grounds Asserted in the Instant Rule 60(b) Motion

Petitioner seeks to vacate the dismissal of his *habeas* petition on grounds asserted pursuant to Rule 60(b)(1), (2), (3), and (6). Rule 60(b)(1) authorizes setting aside a judgment for "mistake, inadvertence, surprise or excusable neglect." Rule 60(b)(2) grants relief when there exists "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Rule 60(b)(3) provides relief due to "fraud ... misrepresentation, or misconduct by an opposing party." And, finally, Rule 60(b)(6) is the catch-all provision for vacating a judgment for "any other reason that justifies relief." In the context of the instant case, the "mistake" provision in Rule 60(b)(1) requires the most analysis.

■ At the outset, the Eleventh Circuit has stated that "our precedents set a high standard for granting postjudgment relief under Rule 60(b)." *Zakrzewski v. McDonough*, 490 F.3d 1264, 1267 (11th Cir.2007); *see Sherrod v. Palm Beach County School District*, 237 Fed.Appx. 423, 425 (11th Cir.2007). Rule 60(b)(2) does not support vacating the dismissal of this *habeas* petition on the basis of the § 2244(d) time bar. The issue in this case is whether petitioner can carry the burden

of proving his "actual innocence" of the murder of Linda Offord, in order to open a gateway for consideration of his otherwise time-barred claims. The court's judgment found that he could not do so, and therefore the petition was dismissed as time barred. Petitioner's Rule 60(b)(2) motion asserts that there is "newly discovered" evidence of his innocence that could not have been discovered previously with due diligence. To persuade the court to vacate the dismissal on this ground, petitioner must meet a five-part test, as follows:

> For a district court to grant relief based upon newly discovered evidence under Rule 60(b)(2), the moving party must satisfy a five-part test: "(1) the evidence must be newly discovered since the trial; (2) due diligence on the part of the movant to discover the new evidence must be shown; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be such that a new trial would probably produce a new result." [*Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1309 (11th Cir.2003)]. "A motion for a new trial under Rule 60(b)(2) is an extraordinary motion and the requirements of the rule must be strictly met." *Id.* (quoting *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1316 (11th Cir.2000)).

*Gundotra v. U.S. Dept. of I.R.S.*, 160 Fed. Appx. 834, 836 (11th Cir.2005). That test cannot be met in this case. The six documents described above are nothing more than "cumulative or impeaching" of other testimony at trial, or could have been secured with diligence at the time of trial. April Harris testified at trial, and her police interviews and grand jury testimony are simply impeaching or cumulative of her trial testimony. Crystal Floyd and Crystal Epperson were available and known witnesses, who could have testified at trial, but were not called by either side. The absence of their testimony is due to lack of diligence, not because of recent discovery.

Other evidence now offered by petitioner also was or could have been available at the time of trial, had he used diligence. Sam Gibbons was alive at the time of trial, and could have been called to testify about his shotgun borrowed by Venn weeks before the murder. If Gibbons' gun was a 16–gauge shotgun, petitioner could have subpoenaed it and offered it at trial. Likewise, evidence from the autopsy of the victim relating to blue marks on her hands and an abrasion on her forearm, as well as police notes from interviews of Harvey Venn, were known to and available to petitioner at the time of trial. This is not new evidence. Although the expert testimony of Dr. Gill is new, petitioner could have offered similar evidence at the time of trial simply by using the autopsy report and police interview notes existing at that time. The same is true of petitioner's family members, who now claim to be able to testify that petitioner returned his stepfather's borrowed shotgun (argued by the prosecution to be the murder weapon) the day *before* the murder. They were known to and available to petitioner at the time of trial, and could have been called to testify to that fact. None of this is new evidence. In fact, it is old evidence, the essence of it having been offered at trial through the testimony of Hope Chamberlain and Glenn Kuenzel. Petitioner is not entitled to relief from the judgment of dismissal on this basis.

 Nor is petitioner entitled to relief from the judgment under Rule 60(b)(3) due to fraud, misrepresentation, or misconduct by the respondents. At most petitioner's only argument is that respondents recently produced six documents not previously produced to him; but, as explained above, none of these documents warrants setting aside the dismissal of the petition,

because none of them proves (or even implies) petitioner's actual innocence. Further, to prove fraud or misconduct sufficient to invoke Rule 60(b)(3), the petitioner must show fraud that attacks the function of the court itself. As the Eleventh Circuit has explained, " 'Fraud upon the court' ... embrace[s] only that species of fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Travelers Indemnity Co. v. Gore,* 761 F.2d 1549, 1551 (11th Cir.1985); *Zakrzewski v. McDonough,* 490 F.3d 1264, 1267 (11th Cir.2007). There is no assertion here that the respondents have committed fraud directed at the court, have made any misrepresentations to the court, or have otherwise acted in a fashion that had the effect of preventing the judicial machinery from performing in the usual manner. Petitioner is not entitled to relief under Rule 60(b)(3).

■ Likewise, the "catch-all" provision of Rule 60(b)(6) does not warrant relief from the dismissal of the petition. Aside from arguing that there is new evidence that respondents failed to produce to petitioner through fraud or misconduct, petitioner has not pointed to any other basis for arguing that there is a sufficient ground to set aside the court's previous finding that he failed to prove his actual innocence.

■ As stated above, the "mistake" provision of Rule 60(b)(1) requires the most analysis. This is because the dismissal of the petition was the result of the court's conclusion that the petition is time-barred under § 2244(d); there was no adjudication "on the merits" of the claims alleged in the petition. In its unpublished opinion in *Turner v. Howerton,* —— Fed.Appx. —— – ——, 2007 WL 3082138, *3–4 (11th

Cir.2007), the court of appeals determined that, under Rule 60(b)(1), a "mistake" can include a legal error if the error has the effect of precluding the *habeas* court from addressing the merits of the claims alleged in the petition. The court said, "Under *Gonzalez,* a legal error may be a 'mistake' within Rule 60(b) when the purported error occurred in a 'previous ruling which precluded a merits determination,' such as a denial based on procedurally barred or unexhausted claims." *Turner v. Howerton,* —— Fed.Appx. —— – ——, 2007 WL 3082138, *3–4 (11th Cir.2007) (citing *Gonzalez v. Crosby,* 545 U.S. 524, 532, 125 S.Ct. 2641, 2648, 162 L.Ed.2d 480 (2005)). Although *Turner* involved procedurally defaulted or unexhausted claims, there is no reason to conclude that this rule does not apply as well to § 2244(d) time-bar determinations, which, of course, are procedural in nature and have the effect of precluding consideration of the merits of the claims alleged. Therefore, to the extent a "mistake" by the court in applying the time bar precluded consideration of the merits of petitioner's claims, relief from the time-bar dismissal would be available under Rule 60(b)(1).

■ In the instant case, petitioner argues in support of his Rule 60(b) motion that a "mistake" was made on the *procedural* question whether the one-year time limitation barred consideration of his claims "on the merits." He notes that the ultimate basis on which the petition was dismissed was that it was untimely filed outside the § 2244(d) one-year limitation. The narrow issue addressed in the December 2009 dismissal was whether petitioner could show "actual innocence" as a gateway through which to escape the time limitation and obtain consideration of his claims "on the merits." In that sense, the "actual innocence" question is comparable to such procedural questions as "cause and

prejudice" excusing a procedural default or whether there has been a "full and fair presentation" of a claim to state courts for exhaustion purposes. As the Eleventh Circuit indicated in *Howerton,* a "mistake" in ruling that petitioner did not sufficiently prove actual innocence for purposes of escaping a procedural bar is a "defect" in the integrity of the proceedings that precluded a consideration of his claims "on the merits." That kind of "mistake" can be addressed in a Rule 60(b)(1) motion, and is not simply a challenge to the court's previous ruling "on the merits" of a *habeas* claim.

Because the court is unpersuaded that the dismissal of the petition should be set aside under Rules 60(b)(2), (3), or (6), the real Rule 60(b) question is whether a "legal mistake" in the court's previous analysis of petitioner's actual innocence caused the court to find that he has not proven "actual innocence" as a gateway for consideration of the merits of his substantive *habeas* claims. With this in mind, the court will examine the newest evidence petitioner has offered against the backdrop of the trial evidence, as well as the evidence he presented prior to the dismissal of the *habeas* petition, to address the question whether the court mistakenly concluded that petitioner had not shown his "actual innocence."

### D. *Petitioner's Evidence of Innocence*

■ Looking anew at the evidence presented in order to address the ultimate question of actual innocence, the standard the petitioner must meet in order to obtain a "gateway" for consideration of his substantive *habeas* claims requires him to present "new and reliable evidence" that was not presented at trial. The new evidence need not be admissible under the strict rules of evidence. In doing so, the petitioner must prove, in light of both new and old evidence, that it is " 'more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt....' " *Doe v. Menefee,* 391 F.3d 147, 161–162 (2d Cir.2004), cert. denied, 546 U.S. 961, 126 S.Ct. 489, 163 L.Ed.2d 364 (2005), quoting *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Stated another way, the petitioner must carry the burden of proving, in light of all the evidence, that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. If *any* reasonable juror *could* find him guilty beyond a reasonable doubt, notwithstanding the "new and reliable evidence," petitioner has failed to prove his actual innocence for purposes of the *Schlup* gateway.

### (1) *Summary of Trial Evidence*

A place to be begin looking at the actual innocence question is the evidence presented at trial, on which the jury convicted petitioner. The forensic evidence established that the victim, a convenience store clerk, was killed by a single shot from a 16–gauge shotgun between 11:05 and 11:20 p.m., the night of November 9, 1987. The last sale on the cash register tape was at 11:05 p.m., and the victim was discovered by the third-shift clerk, who arrived at 11:20 p.m. The shot struck the victim in the upper right chest and passed through. Most of the No. 1 buckshot left her body through several exit wounds in the upper back. There was no other significant forensic evidence at the scene, no useful fingerprints, or fiber evidence. The murder weapon was identified as a 16–gauge shotgun based on plastic "wadding" from a 16–gauge Remington shotgun shell found in the victim's body.

It is fair to say that the principal evidence against petitioner was the testimony of his alleged co-defendant, Harvey Venn. Venn and his car were identified by a number of witnesses as being at Joe Bob's

Convenience Store anywhere from 10:00 p.m. to 11:00 p.m. that night. Several witnesses saw and acknowledged Venn at the scene. They also saw another man in Venn's car, but, for various reasons, none got a good look at the other man or could identify him. One witness said the other man had a mustache and bushy hair.

The police contacted Venn and interviewed him several times, the first being two days after the murder, on November 11, 1987. At the time, Venn and petitioner were living together in petitioner's house. They knew each other from working together at Madex in Goodwater, Alabama. Venn was 18 years old; petitioner was in his mid-twenties. In his initial interviews, Venn denied any knowledge of or role in the shooting. He claimed to have driven to Fayetteville, Alabama, the night of the shooting to visit a friend, Chris Morris. He said that when he arrived at Morris's house, he discovered that Morris was not there, and he returned home between 10:00 and 10:30 p.m.

After the police left the interview, one officer realized that he had left his notepad at Venn's residence, and he instructed another officer to go back and retrieve it. Upon arriving at Venn's residence, the officer found Venn and petitioner sitting at the kitchen table, and petitioner was writing in a spiral-bound notebook.

Three days later, on November 14, police returned to the residence and obtained consents to search from both Venn and petitioner. As a result of this search, police seized a .32 caliber pistol and a spiral-bound notebook with writing in it. Venn was interviewed again on November 14 at the Sylacauga police station, at which time he confessed that he and petitioner had attempted to rob the convenience store and that petitioner shot the clerk. During this confession, Venn stated that petitioner used a 16–gauge shotgun and that petitioner had disposed of the spent shotgun shell

by putting it in a paper bag and burning it in a trash barrel in the yard. Petitioner was arrested the next day, November 15, 1987. A search warrant was obtained and the residence searched again on November 16, at which time the brass head of a burned 16–gauge Remington shotgun shell was retrieved from a 55–gallon barrel used to burn trash in the yard of the residence.

Venn testified at trial to the following events: On Monday, November 9, he and petitioner left work at Madex and arrived home around 2:30 in the afternoon. After taking a shower and drinking a beer, both left in Venn's car around 3:30. In the backseat of the car were a 16–gauge shotgun petitioner borrowed from his stepfather (Glenn Kuenzel), a 12–gauge shotgun Venn borrowed from Sam Gibbons, and a .32–caliber pistol. Venn dropped off petitioner at petitioner's parents' house and then drove to visit his 13–year–old girlfriend, Crystal Floyd. He arrived there around 4:00 and remained for 45 minutes to an hour. He returned and picked up petitioner between 4:45 and 5:00 p.m.

Venn and petitioner continued to ride around in Venn's car the rest of the evening, stopping several times at Joe Bob's to use the restroom. According to Venn, petitioner raised the idea of robbing the convenience store, saying he knew how they could get some money. Venn and petitioner drove to Joe Bob's around 10:00 p.m. There, Venn saw several people who knew him. He and petitioner left and came back later, closer to 11:00 p.m. According to Venn, petitioner waited until no customers were around, then he got out and covered the car's license plate with a paper sack. Petitioner then covered his face with a ski-mask, took the 16–gauge shotgun, and went into the store by himself. Venn waited in the car. Venn could see only a portion of the gun, but he heard a shot and saw the clerk fall backward

away from the counter. Petitioner then ran out and jumped in the car, saying "Haul ass." According to Venn, petitioner said he "didn't mean to do it." Later, while riding home, petitioner pulled out the .32 caliber pistol from beneath the passenger seat and said to Venn, "What happened to one can happen to another." (Trial Transcript, p. 144).

Venn and petitioner drove to their residence and removed the guns and a ski-mask from the car. According to Venn, petitioner took the spent shell from the 16–gauge shotgun, put it in a paper sack, and threw it in the trash barrel in the front yard. Petitioner and Venn then listened to record albums for a while, and petitioner made the statement that it was "a shame the lady had to die for money that was not hers."

On cross-examination, Venn admitted that he and petitioner had been drinking beer and smoking marijuana the night of the murder. He admitted that he had borrowed the 12–gauge shotgun from a co-worker, Sam Gibbons, to go squirrel hunting with his girlfriend's brothers. Venn acknowledged that there was a red substance on both the left thigh of his blue jeans and on the shoes he wore that night. He indicated that he thought it was squirrel blood, and he had no idea how he could have gotten the victim's blood on his pants. (The jury heard a state serologist testify later that the red substance on Venn's pants matched the blood of the victim, but the red substance on his shoes was not human blood.) Venn denied that the "other man" seen with him by witnesses was Chris Morris, and he insisted that only petitioner was with him that night.

The prosecution offered other evidence to bolster Venn's testimony. First, the prosecution offered the testimony of a handwriting analyst to show that the handwriting in the spiral-bound notebook seized from petitioner's residence was petitioner's, and that the contents of the writing matched the details of Venn's first statement to police, in which Venn denied he was involved in the shooting and had gone to Fayetteville to visit his friend, Chris Morris. The analyst based the conclusion that the writing was petitioner's on a comparison of the notebook with petitioner's employment application at Madex. The prosecution also offered evidence that petitioner vigorously resisted efforts to obtain from him comparison handwriting exemplars, with petitioner refusing to obey a grand jury subpoena and a court order to do so. The prosecution argued that the writing represented an attempt by petitioner to keep his and Venn's exculpatory stories consistent, and that petitioner's refusal to provide handwriting exemplars proved his guilty state of mind.

Next, the prosecution offered testimony from a firearms expert that the burnt brass shell head found in the trash at petitioner's home had been fired from the 16–gauge Harrington & Richardson shotgun petitioner borrowed from his stepfather. The expert explained that he compared the shell head with several shotgun shells he test fired from the Harrington & Richardson shotgun, and found that the gun left the same microscopic marks on the brass heads of all of the shells. The expert was not able to say, however, when or under what circumstances the burnt shell had been fired.

Third, one of petitioner's co-workers at Madex testified that, between 5:00 and 6:00 p.m. the evening of the shooting, Venn and petitioner came by Madex together and sold him some diet pills, representing them to be "speed." This, the prosecution argued, confirmed part of Venn's description of the events during the evening of the shooting.

Fourth, the prosecution offered the testimony of April Harris, a 16 year-old girl who knew both Venn and petitioner. April

Harris testified that she was a passenger in a truck driven by Crystal Epperson the night of November 9, and that she and Epperson had driven by (but not stopped at) Joe Bob's sometime between 9:30 and 10:00 p.m. She noticed Venn's car, with which she was familiar, and then, according to her testimony, saw both Venn and petitioner standing inside the door of the store.

Fifth, the prosecution offered the testimony of Diane Mason that, while driving home from work after 11:00 p.m. the night of the murder, she followed a car with its license plate obscured, driving toward Hollins, Alabama, away from the direction of Joe Bob's. She could not otherwise describe the car. This also confirmed part of Venn's account of the murder, that petitioner had covered the license plate of Venn's car with a paper sack.

■■■ Although petitioner did not testify at trial,[5] he offered the testimony of three witnesses. First, his stepfather, Glenn Kuenzel, testified that he had gone to petitioner's house the night of November 9 to replace a broken toilet tank. Upon arriving at 10:30 p.m., Glenn knocked on the door, but no one answered. He looked in a window, saw petitioner asleep on the couch, and left. Glenn also testified that he saw his 16–gauge Harrington & Rich-ardson shotgun at his own house around 2:30 on the afternoon of November 9, *before* the shooting. He testified that he had seen it leaning against the wall in his kitchen when he came home from work.

Next, petitioner presented the testimony of Hope Chamberlain that she was present at Glenn Kuenzel's home on Sunday, November 8 (the day before the shooting), when petitioner and Venn returned "a gun" to Glenn. She could not otherwise describe the gun, except to say that the barrel was about the diameter of a pencil. When shown the Harrington & Richardson shotgun put into evidence by the prosecution, she was unable to say that it was or was not the same gun she saw returned.

Finally, petitioner called Tony McElrath as a witness, who said that Venn was the shooter he witnessed kill Linda Offord at the convenience store. But when asked to point out the killer, he pointed at petitioner sitting at counsel table. McElrath also claimed he was at the store around 3:00 (not 11:00 p.m.) and heard two shots, not one.[6] McElrath also testified that he received treatment at the local mental health center.

After the jury returned a verdict of guilty to capital murder, additional evidence was offered during the penalty phase of trial.[7] Petitioner's mother testi-

---

**5.** Petitioner had a constitutional right to elect not to testify at trial, and from that decision the court can draw no inference. However, the court notes that petitioner has never stated under oath in the instant *habeas* case that he did not commit the murder. He has filed only an *unsigned* affidavit. Certainly, the absence of a sworn statement by the petitioner denying any role in the murder makes a finding of his actual innocence more difficult. Where the petitioner has the burden of proof on the issue of actual innocence, the Fifth Amendment privilege does not preclude the court from drawing an adverse inference from his failure to proclaim his innocence under oath.

**6.** It should be noted that both 16–gauge shotguns identified in this case—Glenn Kuenzel's Harrington & Richardson and Sam Gibbons' widow's Iver Johnson Championship—are *single* shot, top-break shotguns. Neither can be fire more than once without reloading. Also, there was no forensic evidence at the scene or on the victim of more than one shot being fired.

**7.** Although the jury did not hear this evidence in reaching their guilt determination, the court believes it is appropriate to consider penalty-phase evidence on the issue of actual innocence now before it. Evidence tending to prove or disprove actual innocence is relevant in assessing whether petitioner can sufficiently prove his entitlement to a full consideration

fied about his childhood without a father, his dropping out of school, and his involvement with drugs. His ex-wife testified that petitioner has a son who loves him. A mental health counselor was presented to testify that petitioner has average to low-average intelligence and suffers from depression, but otherwise suffered no mental health issues. Petitioner testified in his own defense during the penalty phase of trial, denying that he or his mother had offered money to Orrie Goggans for Goggans to testify that it was he, not petitioner, who was with Venn the night of the murder. Petitioner also admitted that he had escaped from jail during his pretrial incarceration. It is significant to note that, during his penalty-phase testimony, petitioner was never asked about his involvement in the murder, nor did he expressly deny it or proclaim his innocence. (Trial Transcript, pp. 752–763).

For rebuttal during the penalty phase, the prosecution put on evidence from two of petitioner's co-workers, who testified that as early as 6:15 the morning after the shooting, petitioner asked them if they had heard about the shooting the night before and the fact that nothing had been taken from the store. Neither of the co-workers had heard any media reports about the shooting, and their first information about it came from petitioner. One of the co-workers testified about a conversation he had with petitioner the day after the shooting, in which petitioner expounded on the difference between a "modern-day asshole" and a "capital asshole." The witness testified as follows:

A: Okay. We walked over there and Billy said that all of us guys around there at work was a bunch of modern-day assholes. And I says, "Modern-day assholes?" and he said, "Yeah." And

then he says, "Me and Harvey, we're capital assholes. Don't nobody get over on us like y'all." And he says, "We won't let nobody get over on us. You guys let people get over on you." I says, "What's the difference, Billy?" And he says, "Well, capital assholes, like I said, won't let nobody get over on you," and then he says, "Me and Harvey, we could kill somebody and get by with it."

I said, "You really believe you could kill somebody and not get caught, or get killed yourself?" And he says, "Well, I might get killed myself, but I know I wouldn't get caught." He said, "If you're going to kill somebody, you shoot them with a shotgun. You don't kill them with a pistol or rifle. They will trace the bullet back to you." And then he says, "Just like that girl over in Sylacauga. They don't have a clue to who did that, and they won't."

I just shook it off, you know, and walked on.

(Trial Transcript, pp. 772–773).

In addition to the testimony of the co-workers, the prosecution offered the testimony of Orrie Goggans, who testified that petitioner and his mother tried to work out a deal with him for Goggans to testify that it was he (Goggans), and not petitioner, who was with Venn the night of the shooting. Goggans testified that both petitioner and his mother offered him an unstated sum of money to so testify.

#### (2) New Evidence of Innocence Offered by Petitioner

All of the new evidence of innocence offered by the petitioner amounts to different ways of attempting to undermine the credibility of the prosecution's evidence, in

---

of his *habeas* claims, not just whether the jury had sufficient evidence before them to convict. The court must examine the actual in-

nocence issue in light of all the evidence. *See Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

particular the credibility of Venn's version of the events. There is no evidence that can be described as directly probative of the petitioner's innocence, such as new DNA evidence, new forensic evidence, new alibi evidence, or a confession by someone claiming to be the murderer. Although petitioner attempts to describe some evidence as "new," as explained below, the basic facts of the evidence existed at the time of trial and is not really new. The petitioner's factual innocence argument boils down to trying to raise as many doubts as possible about the credibility of Venn's description of the events.

*A. The Murder Weapon*—Petitioner has offered the affidavit of Carolyn Lewis Gibbons (Doc. 45–2), which states that, about two weeks before the shooting in 1987, Harvey Venn came to her and her husband's home between 10:00 and 11:00 one night to borrow her husband's shotgun, purportedly to go hunting. She could not state when or by whom the gun was returned, but it remained stored, even after her husband's death in 1991. Soon after learning of the shooting in 1987, her husband expressed to her concern that his gun might have been the murder weapon, but he told her later that the police ruled out his gun after looking at it. Years later, she delivered the shotgun to petitioner's investigators, who identified it as a 65–year old Iver Johnson Champion top-break 16–gauge shotgun.

Petitioner also has offered the affidavit of Carl Majeskey, identified as a firearms expert. (Doc. 45–3). He testified that Gibbons's 16–gauge shotgun could have been the murder weapon, but stated no new factual findings supporting his conclusion, which amounts to nothing more than speculation. His affidavit simply criticizes the conclusion reached in 1987 by the state firearms expert, Lawden Yates, that the burnt shotgun shell found in the trash barrel at petitioner's home had been fired from the Harrington & Richardson 16–gauge shotgun borrowed by petitioner from his stepfather. There is nothing in Majeskey's affidavit that suggests why the Gibbons gun is more likely the murder weapon than Glenn Kuenzel's gun. Indeed, Mrs. Gibbons' testimony that her husband told her that the police had ruled out his gun tends to undermine the possibility that the Gibbons gun was involved.

With this evidence, petitioner attempts to raise doubts about Venn's testimony that there was a 12–gauge shotgun and a 16–gauge shotgun in the car the night of the robbery by implying that Venn also possessed a 16–gauge shotgun that could have been the murder weapon. Whether, in fact, Venn possessed a 16–gauge shotgun is questionable. On this point, Mrs. Gibbons' testimony is that her husband told her that the police inspected and ruled out his gun. She obviously is unable to say, in fact, that it was her husband's gun that Venn possessed the night of the robbery. While Mrs. Gibbons can testify that her husband told her that Venn borrowed his shotgun, she cannot possibly say that Venn never borrowed a shotgun from anyone else. The fact that Venn borrowed the Gibbons' gun about two weeks before the shooting does not account for when the gun was returned, nor does it not rule out the possibility that Venn also borrowed a 12–gauge shotgun from someone else. Although Mrs. Gibbons testified that her husband was concerned that his gun may have been the murder weapon, she expressed no knowledge of how or when Venn returned the shotgun. Also, in Venn's initial statement to the police on November 11, 1987 (a statement in which he denied knowledge of the shooting), he stated explicitly that he went squirrel hunting the day before the shooting with a *12–gauge* shotgun. (Doc. 136–2). Further, Dennis Surrett, an investigator in the district attorney's office, testified that, al-

though he did not have a recollection of talking to Sam Gibbons, he wrote a note on a trial witness list in which he annotated that Gibbons would testify to lending a *12–gauge* shotgun to Venn.

These facts collectively undermine the otherwise unsupported speculation that Venn not only possessed a 16–gauge shotgun, but used it himself to kill Linda Offord. Even assuming Majeskey's testimony is sufficient to raise doubts about Yates's testimony that the burnt shell was fired in Glenn Kuenzel's gun, it is not enough to reach the conclusion that Venn not only possessed a 16–gauge shotgun, but used it to murder the victim. Petitioner cannot prove his actual innocence with this evidence.

Additionally, it must be considered that none of this testimony is really "new." While Majeskey's participation is new, the underlying facts informing his speculation were known at the time of trial. Sam Gibbons was alive at the time of petitioner's trial, and he could have been subpoenaed to produce his gun for examination if there were a genuine concern that it was a 16–gauge involved in the crime. Dennis Surrett, an investigator in the district attorney's office, wrote a note on a trial witness list suggesting that Gibbons' gun was a 12–gauge, not a 16–gauge. Defense counsel was aware from Venn's police statements, produced to them in discovery, that Venn borrowed Gibbons' gun, and they could have made it an issue if it was actually significant.

It appears to be undisputed that the murder weapon was a 16–gauge shotgun, and it is clear that the Harrington & Richardson shotgun owned by petitioner's stepfather was a 16–gauge. Majeskey's criticism of Yates's expert opinion only raises a question of how much weight should be given Yates's testimony. Majeskey's testimony that the Gibbons' gun might have been the murder weapon

is entirely unsupported speculation, and cannot be squared with Mrs. Gibbons' testimony that the police examined and ruled out her husband's shotgun as the murder weapon. No particular shotgun can be identified definitively as the murder weapon. The best that can be said is that it was a 16–gauge. Majeskey simply has no factual basis for asserting that the Gibbons' gun is more likely the murder weapon than Glenn Kuenzel's gun. At least Yates testified that the latter is the one that fired the burnt shell head found in the trash at petitioner's home; there is no physical evidence linking the Gibbons' gun to petitioner, his home, or to Venn. While this evidence may raise doubts about Venn's credibility, it does not affirmatively prove petitioner's innocence.

Petitioner has offered the affidavit of Glenda Kuenzel (Doc. 45–11), petitioner's sister, who states that she saw petitioner and Venn return the borrowed Harrington & Richardson 16–gauge shotgun to her stepfather the day *before* the shooting; therefore, according to petitioner, it could not have been the murder weapon. Similar testimony was offered at trial through Hope Chamberlain and Glenn Kuenzel; however, their accounts were clearly rejected by the jury. Not only is Glenda Kuenzel's testimony not "new," there is no reason to believe it would change the outcome of the jury's assessment of the facts when it is obvious that Chamberlain's and Glenn Kuenzel's similar testimony did not. This testimony is merely cumulative of other trial evidence, and for that reason, is not sufficient to support a finding of actual innocence.

In total, the evidence now offered by petitioner with respect to whether Venn possessed a 16–gauge shotgun or whether the Kuenzel shotgun had been returned to petitioner's stepfather before the robbery do not support a finding that petitioner is

actually innocent of the robbery and killing. At best the evidence is cumulative of trial evidence and does nothing more than raise impeachment issues concerning Venn's testimony. A jury saw and heard Venn testify in person, and that jury, which the court assumes was composed of reasonable people, found his testimony credible despite many of these same impeachment issues being raised then. Nothing in the evidence presented now persuades the court that reasonable jurors would be any more likely to reject his testimony than the trial jury that heard it before.

*B. April Harris's Identification of Petitioner*—At trial, April Harris testified that, as she and Crystal Epperson rode by the store between 9:30 and 10:00 p.m. the night of the shooting, she saw Venn's car and then saw both Venn and petitioner standing inside the door of the store. This testimony was important at trial because it not only confirmed part of Venn's testimony that he and petitioner were together not more than an hour and a half before the shooting, but also because it undermined petitioner's alibi that he was at home alone and asleep. In this *habeas* action, petitioner has offered the declarations of Luther Brannon (Doc. 45–4) and Everson Thompson (Doc. 45–5) to the effect that neither Brannon nor Crystal Epperson believe it was possible for April Harris to see and identify anyone inside the store from the distance she was at that night. Brannon's affidavit describes his own trip to Joe Bob's and measurements he made there. Thompson's affidavit contains an unsworn and unsigned transcript of an interview with Crystal Epperson, in which she expresses the opinion that Harris could not have seen what she claimed.

This evidence also is insufficient to prove petitioner's actual innocence, or, stated another way, is insufficient to prove that it is more likely than not that no reasonable jury could have found him guilty beyond a reasonable doubt. Again, this evidence simply is not "new," and it merely raises a question about the weight to be accorded April Harris's testimony; it does not prove her testimony to be false or perjurious. April Harris testified that she saw petitioner standing in the store with Venn. Brannon and Epperson state simply that they do not believe her, but they offer nothing to prove that Harris lied about what she claimed to see. Epperson's statement (reported through Thompson's declaration) is not "new." She was available at the time of trial and could have testified, but did not. Because Brannon's testimony consists of nothing more than his opinion based on observations he made at the store, any number of people familiar with the physical layout of Joe Bob's could have been called to testify to the same thing at trial. Furthermore, Brannon's observation of the store came many years after the shooting, and there is no assurance that the lighting and physical layout of the store was the same as on the night of the shooting. This evidence is simply an attack on the credibility of Harris's testimony, which a jury has already assessed and found acceptable.

More critical to this fact question is April Harris's grand jury testimony, one of the documents recently produced by the respondents, in which she indicated a great deal more equivocation about what she had seen. Unlike her trial testimony, which was firm and certain, her testimony before the grand jury was that she "believed" she had seen Venn and petitioner in the store, but could not be sure. (Doc. 136–17). Nevertheless, this goes only to the weight to be accorded her testimony, and her equivocation certainly is not enough to prove that petitioner, in fact, was not at the store with Venn.

Once again, the court is not persuaded that the evidence concerning Brannon's and Epperson's opinions make it more likely than not that no reasonable juror could have found petitioner guilty beyond a reasonable doubt. Venn's testimony is more than sufficient to support such a verdict.

*C. Venn's Visits to Crystal Anne Floyd*—Petitioner has offered the 1997 affidavit of Crystal Anne Floyd. (Doc. 45–6), and a 2008 affidavit by her. (Doc. 136–11). At the time of the shooting, she was Venn's thirteen-year-old girlfriend. She testified in the affidavits that Venn visited her twice the evening of the shooting, first before sunset and the second time around 10:00 p.m. According to her, petitioner was with Venn on the first visit, but that Venn was alone on the second visit. Petitioner argues that this proves he was not with Venn at a time just before the murder occurred, contrary to Venn's account.

In response, the State has offered the notes of what appears to be a police interview with Crystal Floyd (Doc. 125, Ex. 1), as well as her 1987 grand jury testimony (Doc. 125, Ex. 2). In the undated and unsigned notes, she told police that Venn visited her *alone* around 6:15 to 6:45 the evening of the shooting, and that she did not see him again until the next day. In her grand jury testimony, she stated that the visit was around 8:00 to 8:30 that night, and that Venn was alone. She made no mention of a second visit. She also testified before the grand jury that, while he was in jail, Venn told her how he and petitioner robbed the store.

Crystal Floyd's testimony is not believable or trustworthy. She has told three different versions of the events that evening: (1) Venn and petitioner visited her at sunset, and then Venn came alone at 10:00 p.m.; (2) Venn alone visited at 6:15 to 6:45; and (3) Venn visited alone at 8:00 to 8:30 p.m. Her testimony raises no real credibility question, except as to her own. It is likely that, by the time she gave the 1997 affidavit, she could not remember the true sequence of events from ten years earlier, and if anything, her recollection in 2008 is even more unreliable, coming 21 years after the events in November 1987. Both the police notes and grand jury testimony occurred not long after the events in November 1987, and in neither of these accounts does she mention a second visit from Venn the night of the shooting. Indeed, in the police notes, she apparently stated affirmatively that Venn did not visit her again until the next day. Floyd's testimony simply is not sufficiently trustworthy to raise any questions about Venn's description of the events that night.

*D. Testimony of New York Deputy Chief Medical Examiner*—Petitioner has offered the affidavit of Dr. James R. Gill, the Deputy Chief Medical Examiner for the Bronx Office of the Office of the Chief Medical Examiner for the City of New York. (Doc. # 137). Dr. Gill testified that he has examined the autopsy notes and photos made by Dr. Embry during the 1987 autopsy of the decedent, as well as notes of the initial police interview of Harvey Venn on November 11, 1987. He observed that in the autopsy notes, Dr. Embry referred to "occasional minute blue marks on the palm and palmar aspect of the right third finger just proximal to the proximal interphalangeal joint" of the victim, as well as a small (1/4 by 3/16 inch) abrasion on her right forearm. Although Dr. Gill stated that his interpretation of this data was "limited due to poor photographic documentation," he opined that the blue marks "may" have been a "patterned contusion," and that the abrasion was consistent with the victim's arm being grabbed or coming into contact with a rough surface. He also explained that, two days after the murder, police interviewed Venn and noted that he appeared

to have a bruised left eye. and bruises on his left arm. The actual police notes read, "Looks like he had a black eye (left)," and "left arm looks bruised." From this information alone, Dr. Gill expressed the opinion that the injuries seen on both the victim and Venn were consistent with the two of them having a physical altercation "with one another." His conclusion reads:

Based on the injuries present on Ms. Offord and Venn shortly after the murder, the evidence is consistent with a factual scenario whereby Venn and Ms. Offord were involved in a physical altercation with one another shortly before Ms. Offord's death. Specifically, the evidence is consistent with a theory that Ms. Offord used her right hand and/or arm to strike at Venn one or more times, that Ms. Offord's strikes caused Venn to shield himself with his left forearm, and that Ms. Offord struck Venn at least once in the left eye causing injury to same.

From this opinion, petitioner argues that it was Venn, not petitioner, who went into the store and murdered Ms. Offord, after she attempted to strike him several times, resisting the robbery.

There are at least three problems with this testimony. First, the evidence is not really new. Both the autopsy report referring to the blue marks on the victim's hand and the abrasion on her arm, and the police notes indicating Venn's black eye and bruised arm, were available to defense counsel at the time of trial. Based on the evidence then available to them, they could have argued the same factual scenario being advanced now by Dr. Gill. Indeed, the defense trial strategy was to lay an alibi for petitioner, while arguing that Venn was the actual shooter. The "factual scenario" that it was Venn, and not the petitioner, who robbed and shot Linda Offord was not accepted by the jury.

Second, even Dr. Gill is not sure what the blue marks on the victim's hand were. His affidavit states:

I note that the Report of Autopsy is not inconsistent with the conclusions I have reached. The fact that the examining physician, *Dr. Joseph Embry, did not note any bruising, swelling, or other marks on Ms. Offord's right hand* does not preclude the conclusion that Ms. Offord was involved in a physical altercation prior to her death. Some physical injuries do not immediately manifest on external examination where death occurs very shortly after a physical trauma. Further, in this scenario, *signs of a physical altercation on a hand would not generally be visible to the naked eye.* The only way that it could be confirmed whether Ms. Offord hit Venn was if Dr. Embry had made incisions into Ms. Offord's hands which would have shown any bleeding or bruising that had not yet become visible on the surface of the skin. Here, there is no evidence that Dr. Embry conducted a more thorough investigation into Ms. Offord's right hand or arm, which is not unusual as this procedure is rarely performed on a decedent without specific need as these portions of the body are visible in an open casket funeral. Thus, *absent the ability to incise Ms. Offord's hands at the time of the autopsy, it is unknowable to a degree of 100% certainty whether or not Venn and Ms. Offord engaged in a physical altercation shortly before Ms. Offord's death.* That said, their injuries are consistent with one having taken place. [Italics added for emphasis]. (Doc. # 137, pp. 4–5).

From this report, it seems that even Dr. Gill cannot be certain that the blue marks noted on the victim's right hand were injuries caused by some physical altercation. Indeed, Dr. Gill states that "signs of a physical altercation on a hand would not

generally be visible to the naked eye," which clearly suggests that the blue marks seen by Dr. Embry were not themselves proof of any injury at all. It is simply not known what the blue marks were.

Third, and perhaps most important, Dr. Gill's conclusion that the forearm abrasion and blue marks on the victim's hand and the bruises on Venn are "consistent with a factual scenario" in which Venn and the victim had a physical altercation "with one another" is utter and unsustainable speculation. Even assuming the blue marks are injuries or bruises on the victim's hand, it is not possible to say with *any* degree of certainty how she received the injuries, much less to say that she got them in a physical altercation with a *specific* person. The abrasion and blue marks may have been caused by an infinite variety of events, any one of which is as likely as the next. For example, the gunshot caused the victim to fall backward with sufficient force that she broke her lower left leg, resulting in "a blue contusion" around the fracture site. It is equally plausible that the abrasion and blue marks on her right hand were the result of falling after the gunshot. It is simply not known how the injuries (if that is what they were) occurred. Likewise, there is no evidence explaining the apparent bruises on Venn. No one, but perhaps Venn, can state how the bruises happened, and without that explanation, all the rest is patent speculation. Venn worked a physically demanding job as a welder and he squirrel hunted frequently, both of which involved the possibility of being bruised on the arms and face. That speculative explanation for Venn's bruises is just as likely as Dr. Gill's. To conclude that these separately-observed injuries on two people were caused by an altercation, much less an altercation "with one another," is simply conjecture, no more reliable than any other guess about the cause of the bruises. Saying that the injuries are "consistent with a factual scenario" involving an altercation between Venn and the victim says nothing more than that the injuries are "consistent" with a limitless number of "factual scenarios" that could explain them. One speculative factual scenario is no more probative than any other.

Ultimately, Dr. Gill tries to bolster his conclusion with the fact that the victim's blood was found on Venn's pants. But this fact was considered by the jury, and it did not change their assessment of Venn's credibility or petitioner's guilt. Dr. Gill's opinion is nothing more than his guess, conveniently favorable to the party who hired him, about these mysterious facts. The court recognizes that the actual innocence assessment is not limited to strictly admissible evidence. Nonetheless, Dr. Gill's expert opinion is not reliable under the standard mandated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). To be admissible, an expert's opinion evidence must be both relevant and reliable. To be reliable, it must be based on "good science," that is, reliable scientific methodologies, not mere guesswork. If the strict rules of evidence applied, the court would have no hesitancy denying the admissibility of Dr. Gill's opinion under Daubert's gatekeeping function. Even when the strict rules of evidence do not apply, the lack of scientific reliability undermines the weight the court is willing to give Dr. Gill's opinion. The court is not persuaded that Dr. Gill's opinion makes it more likely than not that no reasonable juror would believe Venn and find petitioner guilty beyond a reasonable doubt.

*E. Miscellaneous*—Finally, the petitioner has offered several affidavits that appear to relate more to mitigation issues than to his actual innocence of the murder itself. For instance, petitioner has offered the affidavits of his mother, sister, brother,

and a mitigation expert, all to establish that petitioner had a difficult childhood and has been a good and responsible adult, (Docs. 45–10,–11,–12, and–13). He also offered newspaper articles and affidavits from petitioner's trial counsel and post-conviction counsel, dealing with the fairness and difficulties of representing a capital defendant in Alabama. (Docs. 45–9 and–14, and Docs. 136–20,–21, and–22). Also, he has offered his own *unsigned* affidavit, but it is unclear what the court should do with it, since it is unsigned. (Docs. 45–8 and 136–14). To the extent that any of these documents raises potential innocence issues, it is cumulative of evidence already in the record from trial. His sister and brother attempted to bolster their stepfather's trial testimony that he went to petitioner's house to fix a toilet the night of the shooting and saw petitioner there asleep. The trial jury rejected the stepfather's direct testimony on this, and there is no reason to believe that the bolstering testimony would change that assessment. As to other evidence presented, whether petitioner could have made a better mitigation showing during the sentencing phase of trial is irrelevant to the question now presented, that is, can he show that he is *actually* innocent of the murder.

### (3) *Cumulative Assessment of New Evidence*

Petitioner makes the argument that all of his "new" evidence must be considered together for its cumulative effect in undermining the credibility of Venn's testimony. He argues that, cumulatively, all of this new evidence raises such doubts about the truth and accuracy of Venn's account that it is more likely than not that no reasonable juror could rely on Venn's testimony to find petitioner guilty beyond a reasonable doubt.

The court disagrees for the reasons already discussed at length. The testimony of Crystal Floyd is not worthy of belief, and the opinion is Dr. Gill is rank speculation, not factually or scientifically supported. The opinions of Crystal Epperson and Luther Brannon are nothing more than their lay opinions that April Harris could not really see what she swore under oath she saw. Testimony concerning the return of the 16–gauge shotgun to Glenn Kuenzel the day before the shooting, as well as Kuenzel's alibi testimony, is cumulative of testimony heard by the jury at trial, and rejected by them. Mrs Gibbons's evidence that Venn borrowed a 16–gauge shotgun from her husband Sam is so vague, disjointed, and contradicted by other evidence that the court gives it little weight. Because each of these separate pieces of evidence suffers from serious flaws, their cumulative impact on the credibility of Venn's testimony is only slight, and certainly is far from so undermining it to the extent necessary to persuade the court that no reasonable juror could believe it.

As noted in the beginning of this opinion, this case does not involve the introduction of new evidence that positively and affirmatively points to the innocence of the petitioner.[8] There is no new DNA evidence, or forensic evidence, or even highly credible testimony, purporting to show that the petitioner did not commit the murder as Venn said he did. At best, the evidence petitioner offers attempts to raise so many doubts about Venn's credibility that one must reasonably assume Venn's testimony was false. But it has failed to do so. Virtually all of the "new" evidence

8. Even though much of the evidence tends to suggest that Venn, and not petitioner, was the murderer, such evidence does not itself exculpate petitioner. Potential evidence that Venn was actively involved in the shooting does not prove that petitioner was not.

offered by petitioner is itself so flawed the court is unable to say that it necessarily devastates Venn's credibility. A reasonable trial jury believed Venn's story of how the murder occurred. Nothing in the new evidence mandates a finding that no reasonable juror could accept Venn's account as believable, and, therefore, it cannot be said that petitioner has shown that it is more likely than not that he is innocent of the murder.

### Conclusion

Returning to the standard the petitioner must meet in order to show "actual innocence," he must prove that, in light of both the old and "new, reliable evidence," it is " 'more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. . . .' " *Doe v. Menefee,* 391 F.3d 147, 161–162 (2d Cir. 2004), cert. denied, 546 U.S. 961, 126 S.Ct. 489, 163 L.Ed.2d 364 (2005), quoting *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Rich v. Department of Corrections State of Fla.,* 317 Fed.Appx. 881, 882 (11th Cir.2008) ("[T]o meet the actual innocence standard, a habeas petitioner must show that 'in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.' "), citing *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998). The Eleventh Circuit has explained what a petitioner must prove to show actual innocence:

> In a related context, the Supreme Court has held that in order to avoid a procedural bar based on successive habeas petitions and have his petition heard on the merits, a habeas petitioner asserting actual innocence must show that his conviction "probably resulted" from "a constitutional violation." *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995). The petitioner can meet this standard by presenting new

evidence that shows "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* The "reasonable doubt" standard should be based on the district court's "probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329, 115 S.Ct. at 868.

An actual-innocence claim must be supported "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324, 115 S.Ct. at 865. To meet the "threshold showing of innocence" justifying "a review of the merits of the constitutional claims," the new evidence must raise "sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317, 115 S.Ct. at 862. " '[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998).

*Milton v. Secretary, Department of Corrections,* 347 Fed.Appx. 528, 530–531 (11th Cir.2009).

To the extent that petitioner has attempted to offer new evidence, there are serious questions whether the evidence is "reliable." As mentioned, there is no new evidence directly suggesting that petitioner was not involved in the shooting. There are no new "trustworthy eyewitness accounts" or any new "critical physical evidence." Much of the evidence retreads that presented and rejected at trial. Insofar as petitioner offers "scientific evidence" through the expert opinions of Carl Majeskey and Dr. Gill, it is not "reliable," as required by *Schlup.* Majeskey and Dr. Gill both offer nothing but speculation. Majeskey speculates that the 16–gauge

shotgun obtained from Sam Gibbons's widow may have been the murder weapon, but offers nothing to indicate the greater likelihood that it, and not Glenn Kuenzel's borrowed 16–gauge, was the murder weapon. The fact is, no specific gun can be identified as the murder weapon with any certainty. Similarly, Dr. Gill speculates that Venn and the victim had a physical altercation *with each other,* based on nothing more than autopsy observations of a tiny abrasion and mysterious "blue marks" on the victim's right hand and police observation of Venn having a blackened left eye and bruises on his left arm. With no other information about what the blue marks actually were, or how either the victim and Venn received their bruises and abrasion, he conjectures that this evidence is "consistent with a factual scenario" involving not only a physical altercation, but a physical altercation *between* Venn and the victim. But these facts also are "consistent" with dozens of other factual scenarios equally as likely as the one he proposes.

In the end, the "actual innocence" question becomes whether it is more likely true than not true that *no* reasonable juror could believe Venn's account of the shooting, because if a reasonable juror *can* believe Venn's story, that alone is enough to convict the petitioner and reject his actual innocence claim. While there are many credibility problems and unanswered questions, it is hard to see how it would be *impossible* for a reasonable juror to accept his testimony. A jury, in fact, found Venn's testimony believable, even when challenged at trial by (1) the presence of the victim's blood on his clothing, (2) testimony about his lies to police, (3) the existence of a leniency agreement in return for his testimony, (4) the fact that several witnesses who identified Venn failed to identify petitioner as being at the scene, (5) the alibi testimony of petitioner's step-

father, and (6) the testimony concerning the return of the suspected murder weapon to petitioner's stepfather the day *before* the shooting. The fact that a jury did so must demonstrate that it is possible for a reasonable juror to find Venn's testimony believable.

There is, of course, other evidence tending to confirm Venn's account or suggest petitioner's guilt. This consists of (1) April Harris's testimony that she saw Venn and petitioner in the store an hour before the shooting, (2) a police detective's observation of petitioner writing down an exculpatory story repeated by Venn, (3) petitioner's refusal to give handwriting exemplars for comparison to the handwriting in the exculpatory story, (4) co-worker testimony about statements petitioner made early the next morning after the shooting, (5) testimony concerning petitioner's pre-trial escape from jail, and (6) testimony that petitioner and his mother offered Orrie Goggans an unspecified sum of money to testify that Goggans was with Venn the night of the shooting. In light of all of this evidence, old and new, it seems unlikely that it would be impossible for a reasonable juror to find Venn's account believable. Although it is possible that a reasonable juror could reject Venn's credibility, it also is possible that such a juror could accept it. Venn's account of the murder, while full of problems, is not so incredible as to be utterly unbelievable to any reasonable juror. Therefore, petitioner cannot carry the burden of proving his actual innocence.

Having reached this conclusion, it follows that the court did not make a mistake by finding that petitioner failed to show "actual innocence" for purposes of avoiding the § 2244(d) time bar. Because there was no mistake in denying consideration of the merits of petitioner's time-barred claims, he has failed to show any entitle-

ment to relief under Rule 60(b)(1), or any other provision of Rule 60(b). Consequently, the petitioner's Rule 60(b) motion to vacate the previous dismissal of this petition is DENIED.